UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Elizabeth E. Brown

| | |
|---|---|
| In re: ) | |
| ) | |
| JOHN A. LOBATO and ) | Bankruptcy Case No. 11-13982 EEB |
| MANDY G. LOBATO, ) | Chapter 13 |
| ) | |
| Debtors. ) | |
| _____ ) | |
| ) | |
| JOHN A. LOBATO and, ) | |
| MANDY G. LOBATO, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Adversary Proceeding No. 11-1309 EEB |
| ) | |
| VALERIE QUINTANA, ) | |
| ) | |
| Defendant. ) | |

_____

**ORDER DETERMINING AMOUNT AND NONDISCHARGEABILITY OF CLAIM**
_____

THIS MATTER comes before the Court on the Plaintiffs' Complaint, which alleges a claim to determine the dischargeability of a debt under 11 U.S.C. § 523(a)(15) and an objection to Defendant's proof of claim. The Complaint concerns a payment obligation imposed by a divorce decree entered to dissolve the marriage of Debtor John Lobato and his now ex-wife, Defendant Valerie Quintana ("Quintana"). Following trial on the matter, the Court finds and concludes that Debtor's obligation to Quintana is a nondischargeable domestic support obligation, entitled to priority treatment under § 507(a)(1)(A).

**I. Background**

Debtor and Quintana divorced in 1999 after eighteen years of marriage. They had one child who was emancipated at the time of the divorce. The divorce court entered permanent orders on November 15, 1999, which were later amended by order dated February 11, 2000 (collectively "Permanent Orders"). The Permanent Orders divided the couples' property and debts, and awarded maintenance to Quintana of $700 per month for twenty-four months. The maintenance was later extended for an additional five years, on Quintana's motion. In the Permanent Orders, the divorce court made numerous factual findings including that, at the time of the divorce, Quintana was 49 years old and for most of her married life was a stay-at-home mother. In 1996, after her daughter started school, she found work in a daycare, where she

suffered a "serious and debilitating" brain injury during the course of her employment. Although Quintana engaged in extensive rehabilitative and vocational therapy after the accident, she continued to suffer impairments in thinking, memory, and in the performance of multiple tasks. These impairments prevented Quintana from retaining full-time employment. At trial, Quintana testified that she still suffers the effects of her brain injury and is currently unable to retain a full-time job.

The Permanent Orders divided the parties' major assets, including their home, vehicles and Debtor's pension with the City and County of Denver. As relevant to this case, Quintana was awarded the couples' Ford Taurus and the marital home, along with responsibility to pay the first mortgage on that home. Debtor was awarded other vehicles and responsibility to pay the second mortgage on the marital home and the lien on the Ford Taurus. As to Debtor's pension account, the divorce court held as follows:

> [Debtor] shall be awarded as his sole and separate property the DERP pension plan. The Court considered reserving jurisdiction as to the valuation and distribution of the pension benefits. However, upon consideration of the economic circumstances of the parties, including the values of the property set apart to each party pursuant to this Order and the need to distribute marital assets to [Quintana] in an immediate fashion in order to reduce the amount and duration of maintenance, the Court deems a more immediate distribution of the [Debtor's] equitable share of the pension is required. *See In re Marriage of Blake*, 807 P.2d 1211 (Colo. App. 1990). Having considered the statutory factors set forth in section 14-10-113, as well as the speculative nature as to when [Debtor] will actually elect to retire, which may reduce the actual value he derives from the DERP pension, the Court orders [Debtor] to pay to [Quintana] the sum of $60,000.00 as maintenance in gross as her equitable share in the retirement benefits. Payment shall be paid directly to [Quintana] in the following fashion: [Debtor] shall make payment to [Quintana] in the amount of $376.00 per month upon the satisfaction of the encumbrance on the Ford Taurus (pursuant to paragraph 14(e), *supra*); such sum shall be increased by at least $278.00 per month upon satisfaction by [Debtor] of the encumbrance occasioned by the second mortgage (pursuant to paragraph 15 *infra*). Given the duration of the marriage, the financial contributions of [Debtor] during the course of the marriage, and the equally valuable contributions of [Quintana] to the marriage as homemaker, the Court has calculated the equalization payment by [Debtor] in an attempt to fashion an approximately equal division of the marital estate. While the Court recognizes that the ultimate distribution of the marital estate (including the allocation of marital debt as set forth in paragraph 15) is not *precisely* equal, the Court concludes that it is equitable given all of the circumstances.

Plaintiff's Exhibit 2, ¶ 3.

Quintana argues this provision obligated Debtor to pay her $60,000 in monthly installments, once he paid off the second mortgage and the lien on the Taurus. At trial, this Court heard testimony that Debtor eventually paid off the second mortgage and the lien on the Fort Taurus, as required. However, other than the $700 per month maintenance ordered separately by the divorce court, the Debtor never paid any other monies directly to Quintana. In April 2010, using an ex-parte process provided for in the Colorado divorce statute, Quintana applied for and obtained a judgment for unpaid support in the amount of $117,333.72, representing the due and owing portion of the $60,000, plus interest. *See* Colo. Rev. Stat. § 14-10-122.

Debtor eventually remarried. He and his current wife filed for bankruptcy on March 1, 2011. Quintana filed a proof of claim in Debtor's case for $133,074, consisting of the $60,000 awarded by the Permanent Orders, plus over $70,000 in compound interest on that amount. Quintana asserts that her claim is a "domestic support obligation," as defined by the Code, and that it is nondischargeable under § 523(a)(5) and entitled to priority under § 507(a)(1)(A).

Debtor responds that the $60,000 awarded to Quintana is not a domestic support obligation but rather a property settlement which is dischargeable in Chapter 13 and not entitled to priority treatment. Debtor further contends that the $60,000 awarded to Quintana should be offset by the amounts he paid on the second mortgage ($24,845) and on the Fort Taurus ($19,879). Giving credit for those amounts would leave $15,276 of the $60,000 unpaid, according to the Debtor.

## II. Discussion

### A. Domestic Support Obligation

Sections 523(a)(5) and (a)(15) are companion sections that address the dischargeability of a debtor's financial obligations pursuant to a divorce or separation agreement. Subsection (a)(5) excepts from discharge debts for "a domestic support obligation." Subsection (a)(15) excepts from discharge debts that do not fall with the definition of a domestic support obligation but were, nevertheless, "incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record[.]" 11 U.S.C. § 523(a)(15). In common parlance, debts deemed nondischargeable under § 523(a)(5) are generally referred to as being in the nature of alimony or support, while debts under § 523(a)(15) are referred to as being in the nature of a property division.

In Chapter 13, a debtor is entitled to a discharge of most debts after completion a plan. 11 U.S.C. § 1328(a). Certain types of debts are excepted from discharge, including those "of the kind specified ... in paragraph (1)(B), (1)(C), (2), (3), (4), (5), (8), or (9) of section 523(a) [.]" 11 U.S.C. § 1328(a)(2). Notably absent from this list of exclusions are the debts described in 523(a)(15). Thus, while a Chapter 13 debtor cannot discharge domestic support obligations described in § 523(a)(5), nothing in the Chapter 13 discharge provision prevents him from discharging property division debts that fall within the scope of § 523(a)(15).

3

Whether divorce obligation is a "domestic support obligation" or a property division debt has other important implications in a Chapter 13 case. A domestic support obligation is entitled to first priority treatment pursuant to § 507(a)(1). To be confirmed, a Chapter 13 plan must pay any domestic support obligations in full. 11 U.S.C. § 1322(a)(2). On the other hand, property division obligations imposed in a divorce decree are not entitled to priority under § 507(a). As such, a Chapter 13 plan is not required to provide for their full payment and may treat them as any other general unsecured debt.

In this case, the Court must decide whether the $60,000 obligation imposed on Debtor in the Permanent Orders is a domestic support obligation or rather a dischargeable property settlement. The Code defines "domestic support obligation" as follows:

> [A] debt that accrues before, on, or after the date of the order for relief in a case under this title, including interest that accrues on that debt as provided under applicable nonbankruptcy law notwithstanding any other provision of this title, that is--
>
> (A) owed to or recoverable by--
>
>   (i) a spouse, former spouse, or child of the debtor or such child's parent, legal guardian, or responsible relative; or
>
>   (ii) a governmental unit;
>
> (B) in the nature of alimony, maintenance, or support (including assistance provided by a governmental unit) of such spouse, former spouse, or child of the debtor or such child's parent, without regard to whether such debt is expressly so designated;
>
> (C) established or subject to establishment before, on, or after the date of the order for relief in a case under this title, by reason of applicable provisions of--
>
>   (i) a separation agreement, divorce decree, or property settlement agreement;
>
>   (ii) an order of a court of record; or
>
>   (iii) a determination made in accordance with applicable nonbankruptcy law by a governmental unit; and
>
> (D) not assigned to a nongovernmental entity, unless that obligation is assigned voluntarily by the spouse, former spouse, child of the debtor, or such child's parent, legal guardian, or responsible relative for the purpose of collecting the debt.

4

11 U.S.C. § 101(14A). The only provision at issue in this case is subsection (B), whether the debt is "in the nature of alimony, maintenance, or support . . . without regard to whether such debt is expressly so designated." 11 U.S.C. § 101(14A)(B). The determination of whether an obligation was one for support, or instead a division of property, is governed by federal bankruptcy law, but state law can provide guidance. *Yeates v. Yeates (In re Yeates)*, 807 F.2d 874, 878 (10th Cir. 1986). Under Tenth Circuit law,[1] for a debt to be treated as "alimony, maintenance, or support" it must be shown that: (1) the intent of the parties agreeing to it or the court imposing it was for the debt to be support; and (2) the debt is, in substance, support. *Sampson v. Sampson (In re Sampson)*, 997 F.2d 717, 723 (10th Cir. 1993); *Robinson v. Robinson (In re Robinson)*, 113 B.R. 687, 689 (D. Colo. 1990) (where parties' obligations were determined by court order, relevant inquiry is the divorce court's intent). Quintana, as the party seeking to hold the debt nondischargeable, has the burden of proving these elements by a preponderance of the evidence. *In re Sampson,* 997 F.2d at 723.

In considering the first factor, the structure and wording of an divorce decree can provide some evidence of a divorce court's intent. *See In re Yeates*, 807 F.2d at 878 (determination of intent made by looking at the "substance of the agreement viewed in the crucible of surrounding circumstances."); *Tilley v. Jessee*, 789 F.2d 1074, 1077-78 (4th Cir. 1986) (reviewing the "structured drafting" of divorce agreement to determine intent). That evidence is mixed in this case. The divorce court divided its order into two subsections, one captioned "Property Division" and one captioned "Maintenance." The $60,000 awarded to Quintana is under the "Property Division" section. In addition, in making the award, the court referred to Colo. Rev. Stat. § 14-10-113, which lays out the factors for making a property division, rather than the factors governing maintenance (found at Colo. Rev. Stat. § 14-10-114). Such evidence seems to indicate the $60,000 represents a property division. On the other hand, the divorce court also ordered Debtor to pay the $60,000 as "maintenance in gross." Under Colorado law, "maintenance in gross" is a term of art that generally refers to maintenance paid in a lump sum and/or for a fixed duration. *Sinn v. Sinn*, 696 P.2d 333, 336 (Colo. 1985). Although Colorado courts at one time drew a distinction between "maintenance" and "maintenance in gross," in that maintenance in gross could not be modified at a later date, that distinction has since been eliminated. *Id.* In addition, the divorce court indicated it was awarding Quintana a more immediate distribution of Debtor's pension rather than waiting until Debtor's retirement, based on the "economic circumstances" of the parties. These facts provide some evidence that the court intended the award as support.

---

[1] In 2005, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") created a new name, "domestic support obligation," for alimony, maintenance, or support debts. Courts have held that the definition for "domestic support obligation" was derived from the definition of a nondischargeable debt for alimony, maintenance, and support contained in the former § 523(a)(5). As such, case law construing former § 523(a)(5) is still considered relevant and persuasive. *See Taylor v. Taylor (In re Taylor),* 455 B.R. 799, 804 (Bankr. D.N.M. 2011); 4 *Collier on Bankruptcy* ¶ 523.11[5] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

Whatever labels the divorce court placed on the $60,000 award, those labels do not control. *In re Sampson*, 997 F.2d at 722. This Court must also consider the surrounding circumstances at the time of the parties' divorce. *Id.* at 725. Those circumstances strongly indicate that the obligation was intended as support. At the time of the divorce, Debtor was employed full-time with the City and County of Denver and had a substantial pension account. Quintana, on the other hand, had no job and limited work experience. She spent the majority of her eighteen-year marriage as a homemaker. She had suffered from a serious brain injury that prevented her from retaining full time employment. Rehabilitative therapy had not significantly improved Quintana's situation. In other words, Quintana had no means to pay her expenses or to support herself in the future. Based on these circumstances, this Court concludes that the divorce court intended the $60,000 obligation to support Quintana. *Id.* at 725 (finding support obligation where debtor's spouse had no job, no marketable skills, little education, a health condition which limited her ability to work, and no income).

The second prong of the Tenth Circuit test is whether the debt is, in substance, support. The Tenth Circuit has indicated that "[t]he critical question in determining whether the obligation is, in substance, support is 'the function served by the obligation at the time of the divorce.'" *Id.* at 725-26 (quoting *In re Gianakas*, 917 F.2d 759, 763 (3rd Cir. 1990)). "This may be determined by considering the relative financial circumstances of the parties at the time of the divorce." *Id.* at 726. In fact, "a spouse's need for support at the time of the divorce is sufficient to presume that the parties' [sic] intended the obligation as support." *Id.* at 726 n. 7. Here, as discussed above, the parties' financial circumstances were such that Quintana could not support herself. Considering those circumstances, the Court finds that the $60,000 obligation is, in substance, support and therefore qualifies as a nondischargeable "domestic support obligation."

### B. Amount of Quintana's Claim

The other claim alleged in Debtor's Complaint is an objection to Quintana's proof of claim. A properly filed proof of claim "constitute[s] prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). Such a claim is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a). Once an objection is filed, the Court must, after notice and a hearing, determine the amount of the claim as of the petition date. 11 U.S.C. § 502(b). The objecting party has the burden of going forward with evidence supporting the objection. *In re Geneva Steel Co.*, 260 B.R. 517, 524 (10th Cir. BAP 2001). The evidence "must be of probative force equal to that of the allegations contained in the proof of claim" or raise legal issues disputing the claim *Id.* "Once the objecting party has reached this threshold, the creditor has the ultimate burden of persuasion as to the validity and amount of the claim." *Id.*

The parties do not dispute that Quintana properly filed her proof of claim. Debtor objects to the claim because it "wholly fails to credit any of [Debtor's] payments that he made from 1999 to 2007." Complaint at ¶ 29. Debtor asserts that, under the terms of the Permanent Orders, he should be credited $44,724.40, representing the amounts he paid on the second mortgage and the Ford Taurus, leaving a claim of $15,275.60, plus 8% interest. *See* Joint Pre-Trial Statement at ¶ III.2 - III.4.

6

The Court does not find Debtor's interpretation of the Permanent Orders persuasive. The Permanent Orders provide that the $60,000 awarded to Quintana is to "be paid directly to [Quintana] in the following fashion: [Debtor] shall make payment to [Quintana] in the amount of $376.00 per month upon the satisfaction of the encumbrance on the Ford Taurus (pursuant to paragraph 14(e), *supra*); such sum shall be increased by at least $278.00 per month upon satisfaction by [Debtor] of the encumbrance occasioned by the second mortgage (pursuant to paragraph 15 *infra*)." Debtor's Ex. 2 at ¶ 3. The plain meaning of this provision is that the Debtor must pay the $60,000 *directly* to Quintana, not via third party creditors. Debtor was to *begin* paying the $60,000 to Quintana once he had paid off the Taurus. The payment was to be $376 per month until the second mortgage was repaid, at which point the payment would increase by $278. Nothing in the Permanent Orders indicates that the payments on the Taurus or second mortgage were to offset the $60,000. Such an interpretation is inconsistent with other provisions of the Permanent Orders that required *Debtor* to assume sole liability for the debts on the Ford Taurus and the second mortgage. If those debts were his responsibility, his payment of them cannot reasonably be construed as payment of an obligation owed *to Quintana*. A more reasonable interpretation of this language is that the divorce court was allowing Debtor to spread out his payment obligations over time, rather than requiring him to pay them all at once. Thus Debtor could delay payment of the $60,000 until he had paid his other lien obligations, but payment of those liens was not payment of the $60,000. Debtor admits he made no direct payments to Quintana, other than the separately awarded $700 per month maintenance.[2] Accordingly, the Court concludes that Debtor's $60,000 obligation to Quintana remained unpaid as of the petition date.

In addition to the $60,000, Quintana's proof of claim includes interest at a rate of 8%. The Code's definition of "domestic support obligation" provides that it includes "interest that accrues on that debt as provided under applicable nonbankruptcy law." 11 U.S.C. § 101(14(A). Colorado law provides for the payment of interest on unpaid maintenance or property divisions at the statutory rate provided in Colo. Rev. Stat. § 5-12-102. *See In re Marriage of Connell*, 831 P.2d 913, 916 (Colo. App. 1992); *In re Marriage of Schutte*, 721 P.2d 160, 161 (Colo. App. 1986). That statutory rate is 8% compounded annually. Colo. Rev. Stat. § 5-12-102(1)(b). Quintana's proof of claim attaches a table which purports to calculate interest at that rate. *See* Defendant's Ex. E. Debtor did not present evidence to dispute this calculation at trial. As such, the Court adopts Quintana's calculation of her total claim at $133,074.03, as of the petition date. That prepetition claim is hereby deemed allowed pursuant to § 502(b). The full amount of the allowed claim is nondischargeable and entitled to first priority as a "domestic support obligation." 11 U.S.C. § 507(a)(1)(A).

---

[2]In his Complaint, Debtor also argues that the $700 per month maintenance he paid to Quintana for seven years should be credited against the $60,000 obligation. However, Debtor appears to have abandoned this argument in the parties' Pre-Trial Statement and at trial. To the extent Debtor did not waive this argument, the Court rejects it. Debtor does not cite to, and the Court does not find, any provision of the Permanent Orders that suggests that the $700 per month maintenance payment was to credited against the $60,000 obligation.

### III. Conclusion

For the reasons stated above, the Court concludes that Quintana has an allowed claim in Debtor's case for $133,074.03. Quintana has demonstrated that this debt is a "domestic support obligation" as defined by the Code and is entitled to priority under § 507(a)(1). The Court further orders that $133,074.03 is nondischargeable pursuant to § 523(a)(5). A hearing will be scheduled by separate order in the main case on Debtor's motion to confirm his Amended Chapter 13 Plan.

DATED this 29th day of November, 2011.

BY THE COURT:

*Elizabeth E. Brown*

Elizabeth E. Brown
United States Bankruptcy Judge